Good afternoon, Your Honors. Reuben Kahn on behalf of Mr. Loughner. We're here, of course, seeking to preliminarily enjoin the Bureau of Prisons from forcibly medicating Mr. Loughner. We ask that that occur so that the status quo can be maintained and so that Mr. Loughner won't be irreparably injured while this Court has an opportunity to fully consider the arguments that we have regarding the procedures that were employed. Now, I'd like to touch briefly upon the standard to be applied because there's been, in my view, a little bit of confusion about it. I know this Court is fully familiar with the four-pronged standard likelihood of success on the merits, irreparable injury, balance of harms, and the public interest. And, of course, the answer or the analysis of the last two factors will flow from the determination of the first two factors. So I'd like to discuss those briefly and begin with irreparable harm because I think it's the simplest and the clearest of these issues. Now, the government has posited that the irreparable harm we have alleged is of potential or dangerous side effects and has claimed that that is too speculative. But that is not, in fact, the irreparable harm that we have set out. The Supreme Court has thrice recognized the serious intrusion upon personal liberty that occurs when an individual is forcibly medicated with powerful psychotropic drugs. Whether phrased as an intrusion upon autonomy, bodily integrity, or freedom of thought in the First Amendment context, these are serious liberty injuries. And each and every time Mr. Loeffner is forcibly medicated, he is cognizantly injured with regard to that constitutional right. So I really don't think there's any need to discuss that issue. Well, injured, yes, but what about irreparable? Well, this can never be taken back. I mean, his mind has been changed in some way. He has been forced to take medications that he did not want to take. Nothing can reverse the injury that has been done to him in those cases. Well, but you have to be a little bit more concrete than that, just saying, oh, if you take medication, you'll be irreparably injured. If you take aspirin, as far as I know, the effects go away after a while, and you're back to where you were after it leaves your bloodstream. I'm not a doctor, but this is my impression of how aspirin works. What is there here to suggest that whatever will happen to Mr. Loeffner while medicated, the harm irreparable, in other words, permanent or lasting or long-term or in some way changes him on a prevalent basis? Which is what I think irreparable means. The harm from the medication itself may or may not be permanent, may or may not be long-lasting. There certainly are sometimes permanent and long-lasting effects in these medications. But the injury, the particular injury, isn't the injury caused once the medication is ingested in the sense of are they long-lasting or back. It's rather the forcible medication itself is an injury, the being forced to do something against his will. So this is the dignitary injury? It is an injury to his personal dignity, his personal autonomy, his personal liberty to decide whether or not he will take this medication. It is an injury to his first amendment right... I don't think that's what the Supreme Court had in mind when he talked about irreparable injury. If that were the case, then that factor would always go against the government. Well, in forced medication cases, I believe it does. In a forced medication case, that injury is necessarily... Okay, let's say I don't buy that. I'm sorry, Your Honor? Let's say I don't buy that. Do you have it back up? What? I mean, that's it. I mean, if that's your injury, that's it. If you want to rest on that, that's fine. I'm just telling you I'm highly skeptical. It's one thing to say, look, there might be some serious risk. We talked about that in the league about the serious potential risk to health and my result from medication. That I can understand, even if it doesn't actually happen, even if somebody isn't actually injured by any one intake of a medication. Repeated intakes could cause permanent injury. That I understand as being irreparable. But saying, you know, he is insulted by being forced to take a medication, that's irreparable injury. I don't buy it. Mr. Kern, along these same lines, when we talk about forced medication, how did that actually happen? Did he pin him down and use a needle, or did he say, drink this? How does it happen? There are two ways it can happen. It can happen exactly the way Your Honor is discussing. Somebody can be forcibly extracted from their cell by a team of your prison employees, held in four-point restraint and injected with an injectable psychotropic medicine. The other way it can occur is the way it occurred in this case, which is that Mr. Laughner was brought into a room. He was told by officials at the Bureau of Prisons that if you do not take the pills that we're telling you to take, that will occur. So he takes the pills and under threat of being forcibly injected, strapped down and injected with these medications. If I can return briefly to the question that Your Honor asked, Justice Kaczynski, we do also believe that the injuries discussed, of course, in Ruiz, Gaxiola, as well as in Harper and Riggins and Sell, are all irreparable injuries which this Court can recognize and which support our position as well. Well, in Ruiz, Gaxiola, there was actual record evidence. There were people or there were experts testifying to that effect. What is there in this record that suggests that the particular psychotropic drugs being administered, Mr. Laughner, or going to be administered by Mr. Laughner, have these side effects? Well, of course, we haven't had an opportunity to present any evidence in this case. We haven't had any evidence. The answer is nothing? Nothing? No, Your Honor. I mean, if the answer is nothing, that's fine, and we have to figure out why it's nothing. But don't evade the question. What is it in this record that, if anything, that tells us what injury or what irreparable injury or harm to his health might come from these drugs? On this record, there is nothing because there is not even a specificity in the order as to which drugs Mr. Laughner is to take, and it's impossible to discuss potential side effects of a drug without knowing what the drugs are. Now, Harper, Sell, Riggins, Gaziola all talk about the general potential effects of these drugs, and all of these drugs have some similarity in terms of potential effects because they all act the same way. I haven't tracked the cases to figure out are they all the same. I remember one of them involved Melville, and one of them involved Haldol. I mean, there's a whole series of psychotropic drugs. Are they all pretty much the same in all the cases? There's two generations of drugs. There's a first generation which includes drugs like Haldol, a second generation that includes drugs like Risperidone, which is sometimes referred to as atypical antipsychotic. All of them have their effect by acting upon the action of dopamine within the brain. All of them have, to some extent, the same side effects. Experts in these medications will tell you that there are different side effect profiles for the drugs. So one drug may have a greater tendency to result in this side effect. Another may have a greater tendency to result in this side effect. But they all have the same constellation of side effects. Let me just say something. Do we know, as far as this record is concerned, what specific drug or drugs you find is being administered? Your Honor, I believe that on the record before this court we do know, and I apologize for not being absolutely precise, but I believe attached to our initial motion, which was, of course, part of the filing we made in this court, there is a record of the medications that were actually prescribed. In this case, it was Risperidone with a backup of Haldol. In other words, it was to be offered oral Risperidone, and if Mr. Loffner declined the oral Risperidone, then it was to be forcibly injected with Haldol. That's the record. Haldol would be a first generation medication. Risperidone would be a second generation. Who made that determination? That determination would have been made, as far as we can tell from the record, by the treating psychiatrist. It was not made by the fact finder and the administrative proceeding that occurred below. In fact, the administrative decision maker did not, as required by the law, make any determination about what medications would be prescribed, what doses, what duration of treatment would occur. None of that was decided in the proceeding. Counsel, do both of you agree that the standard of review of the warden's order, subjecting your client to forced medication, is arbitrariness? Well, no, we don't agree. One of our contingents, Your Honor, is, of course, that we're entitled to a de novo hearing in the district court on this issue. What statute, case, anything supports your position that you're entitled to a de novo hearing? Well, Your Honor, with regard to that, we are asking the court to apply Matthews v. Eldridge to the differing situations of our client as a pretrial detainee as opposed to the post-conviction long-term inmate involved in other circumstances. Well, but what is the distinction, really, when the – just to back up, what is the purpose of his commitment to FMC Springfield? He's been committed to the institution at Springfield for restoration of competency and for a report on whether or not he's likely to be restored to competency. So part of it was for restoration to competency? Yes. So isn't that the mission of where he's being held in the first place? Indeed, the mission of the institution, at least in part, is to restore him to competency, in large part. And does that not include medical treatment where medical treatment for – I mean, he's diagnosed with schizophrenia, right? Well, but it's clear that if – we're not saying there are no circumstances in which Sir Loftner can be medicated, but it's absolutely clear that if the intent of the institution in forcibly medicating him is to restore him to competency, then all the protections of cell versus United States apply. Well, what's the evidence in the record that that's the intent of this institution? Well, there's a number of pieces of evidence. It began, of course, with the purpose for which he was committed to the institution's custody. I would then go back for – So are you saying that in every case where someone is committed because they've been deemed incompetent to stand trial, that there can be no forced medication under the regulations? No, not at all. Our contention is – Well, then you can't just rely on the purpose of his commitment. I'm not relying solely upon that. Well, what are you relying on? Your Honor, there are several pieces in the record. We begin with that. You said that twice, and you didn't answer my question. What is it that you're relying on? We begin with that piece. I'd go second to the actual competency report prepared by Dr. Pites, who was the treating and evaluating psychologist when Mr. Loftner was first referred to the facility. Dr. Pites, Christina Pites, at the end of her competency report, though it wasn't a part of her brief in preparing the competency report, opined that Mr. Loftner could only be restored to competency by psychotropic medication and that he should be returned to Springfield by the court for treatment pursuant to that. Beyond that, we know from your prison record – Why is that evidence of arbitrariness? It's evidence of their purpose, Your Honor. And the problem we have here is not that they have no right to medicate for dangerousness or they have no right to medicate under certain circumstances to restore to competency. The problem we have here is that there are protections that apply to these. And what's happened is, in our view, the institution has really tried to make an end run around the protections that the Supreme Court said apply when you want to medicate somebody for competency. And so he's returned to the institution after the treating psychologist has already opined that he needs to be medicated for competency. Well, how is this deviated from what Harper requires? Well, it's deviated from what Harper requires in that Harper sets out a number of substantive criteria that have to be met before you medicate somebody for dangerousness. Sets out process, right? No, no. There are two parts of Harper. One part is the procedural due process rights that the individual is entitled to in those particular circumstances. And Harper makes clear again and again that its analysis, its procedural due process analysis, is context-driven. But Harper begins by talking about what are the substantive due process rights to which the individual is entitled before they're medicated. And that's further explicated in Riggins itself. And those are set out in Harper and in Riggins, and we set that out in our papers, are first the rational relationship, the fit between the means that the government seeks to employ and the permissible aims. So in other words, what they're doing has to be directed towards danger. The second of these is that considering less intrusive means, this is that the medication, the course of action is necessary to ensure the safety of either Mr. Laughner or of others. And the third is medical appropriateness. So all of those things have to be met. And the problem that we see here, and it's clear on the record, is if you look at the findings that were made by the administrative officer and affirmed by the warden, none of those are met. And it has to do with the dual motives, that instead of seeking to address dangerousness, they were seeking to address mental illness, seeking to address treatment needs, seeking to address ultimate confidence. Do you dispute the finding of dangerousness? We do. We do, Your Honor. On what basis? Well, we proffered evidence from both the former Bureau of Prisons official regarding the particular conduct of Mr. Laughner and other evidence from a Bureau of Prisons psychologist regarding this type of conduct on the part of another inmate, both of which would have set out that, in fact, this sort of conduct is typical, happens all the time, and is not within the confines of a locked psychiatric prison hospital considered dangerous. Picking up a plastic chair and throwing it at a door? Yes, and at the back of the cell or spitting. But those are common behaviors in a mental hospital, a prison mental hospital, and that they wouldn't normally lead you to. But isn't that one of the problems? Isn't that one of the problems that you have is that we are not supposed to be reviewing what the prison warden did based on our lack of knowledge of what goes on in a psychiatric mental hospital. And so I think the case would say, when it's this kind of administrative forced medication, that we give great deference to the warden's determination. But we, you or I, can't really know what's going on inside that prison. Well, one, we don't believe this is a sort of Administrative Procedures Act arbitration standard of review. We don't believe in light of the interest at stake here that it can be. But even beyond that, if the warden has failed to apply the proper standards, and we believe that he has, you're the warden and the fact finder below the warden, it's necessarily arbitrary. If the legal rights that are at stake are not properly respected, then it's a necessarily arbitrary decision. And that's what occurred here. Because the less intrusive means, which Riggins and Sell require the warden to look to, were disregarded not because they wouldn't have mitigated danger, because they wouldn't have treated underlying mental illness. How can we know that? Because that's the findings say that. The findings of the examiner, the fact finder, and the initial proceedings say, we're not going to use these less intrusive means, not because they don't mitigate danger, but because they won't treat the underlying mental illness. That gets back to the point about medical treatment for Mr. Lochner, that part of this institution's responsibility in every case of the commitment process is to provide medical treatment. It's to attempt to restore him to competency or to report to the court whether or not he can be restored to competency. I guess your point, though, as I understand, and maybe I'm misunderstanding your whole argument here, but I thought it was that the purpose is, as Judge Wardlaw said, to restore him to mental competency, but if they were going to do it with forced medication, they would have to comply with CEL, right? And their response is, well, that's not the situation here. We're only administering forced medication because we found that he was a danger to others. Isn't that right? Isn't that the position? And your complaint, as I understand it, is what they've done is they've used that as an excuse to bypass the CEL requirements. Precisely. Is that right? That's exactly our position. Now, what I don't understand, though, is why they can't do that. Well, if there is real danger. That's right. So even though their purpose is to restore him to mental competency, if there is a true dangerous situation,  Yes and no, Your Honor. There's a problem here, and the problem is, of course, when the Supreme Court decided that the procedures in place in Harper were acceptable and appropriate to protect the rights at issue, it did so relying on those particular circumstances, and amongst those circumstances were that the interests of the doctors who were making the decision aligned perfectly with the rationale that would justify the decision. In other words, their only interest was in maintaining custody of this individual and keeping him safe and keeping others around him safe. So there was no concern that these doctors would be motivated by something other than the governmental interest that would allow them to medicate. That's not the case here for exactly the reasons we've just discussed. There are these dual motivations, and if the motivation is that If they have dual motives, it seems to me that as long as there is true evidence of dangerousness, what difference does it make? But that goes to the procedural protections involved and whether or not there should be deference to those findings made below. In other words, the Supreme Court entrusted these decisions entirely to medical personnel in the prison because it understood that these individuals were unconflicted and independent and would make a decision based on the best medical interest of the individual involved, and that's not really the case here. Let me ask you another question. I know we've let you go over your time, but how do you understand the status quo? I mean, you went to the district court and asked for an injunction. Yes. Is it your position that the status quo was the situation before they began administering the drugs, or do you acknowledge that the status quo was the administration of the drugs? We're asking that the forced medication be halted. We understand that to be the status quo in the sense that we're asking that governmental action, inimical to Mr. Loeffner's rights, be stopped while this court continues. Well, when he arrived at the facility, he wasn't automatically subjected to forced medication. Is that correct? No, he was not. It's only because there were some events that took place that prompted the determination or the assessment that perhaps forced medication would be necessary. The events that took place all took place long before his arrival at the facility the second time. The events upon which the fact finder relied primarily occurred in March and April when Mr. Loeffner was initially committed for evaluation, and that was the time when he threw the chair against the grave and when he spit on one of his attorneys. Then why isn't the status quo the situation before they began to administer drugs? Well, that's what we believe it should be. We're asking the court to put us back in that position while we litigate this issue, to stop the medication while we fully litigate this matter. I'm well over my time, if there are no further questions. Okay. May it please the court, good afternoon. I'm Chris Cavanius from the District of Arizona. The government respectfully asks the court to deny the motion to enjoin and the motion for a stay simply because the defendant has failed to demonstrate that high burden of demonstrating the drastic remedy or earning the drastic remedy of an injunction. Judge Bordlaw, you are to- Why isn't the district court just wrong- Excuse me? Why isn't the district court just wrong as a matter of law by treating this as a Harper case rather than as a Riggins case? He was absolutely correct to treat this as Harper, and here's why. Harper specifically allows the Bureau of Prisons to medicate a defendant who is dangerous and mentally ill as long as two things are met, as long as the inmate is dangerous to himself or others- Harper deals with inmates, whereas Riggins deals with pre-trial detainees. Why isn't that the operative distinction? It isn't because, first of all, the Supreme Court has not made that a distinction. Secondly, as the district court- Okay, why don't we then make it a distinction? As the district court- Why shouldn't somebody who is presumptively innocent be treated death-friendly and with greater personal deference to his integrity than somebody who has been convicted of a crime and who is a permanent inmate? So, again, first of all, Harper did not make that distinction. We would discourage this court from making it. But, second, the district court said when you're dangerous, you're dangerous, and that says it all. And when the Bureau of Prisons has now had someone hospitalized under 4241D, and they are in the process of assessing- Again, I think this motive question has been resolved by the district court that the Bureau of Prisons' purpose for- I don't think you answered my question. I don't think you answered my question. Let me try to get at this from a different perspective, from a different direction. And I want you to listen to the question and try to answer it and not get into something else. Is there anything in the three cases we have in the Supreme Court- Harper, Riggins, and Settle- anything else we have in the Supreme Court that would preclude us from holding today, or in an appeal in this case, that you need a judicial determination of dangerousness before somebody can be medicated who is not an inmate, who is a pretrial detainee? I believe Harper precludes that, and let me explain why. I have Harper, so you don't have to explain. Okay. Point me to the passage in Harper that does it. Because Harper- No, no, can you talk to me where in Harper? Harper did not say specifically. Just tell me where in Harper you're talking about, and that way I can find it. I'm talking about the standard in Harper. Okay, I have some U.S. reports. It is 494 U.S. It starts on page 210. And you just tell me which of those pages between 210 and 257- or 258, where the payment ends- contains the passage that you are now going to rely on. Tell me where. My argument is- No, tell me where. My argument is based on the absence of that statement. My argument is that the United States Supreme Court had a chance in Riggins, had a chance in Snell, and has had a chance since then to say, Harper only applies in the post-trial context. And it has not said that. And I believe- Your answer to my question is nothing. There's nothing in the Supreme Court's opinions that would preclude us from holding today- Well- Or holding in this case that somebody who is a pretrial detainee ought to be treated differently and more deferentially than the inmate in Harper. There's nothing in Harper itself. There's nothing in the Riggins. There's nothing in Snell that would say that this is a conflict. Is that what you're telling us? What I'm saying is that Riggins and Snell do not then say, Harper only applies to pretrial detainees. In other words- They also don't say it only applies to people by the name of Harper. They don't say anything. They don't limit Harper. So there's something in Harper that, by its own force, makes it applicable to pretrial detainees as well as inmates? In Hernandez-Bosquez, Your Honor, this court was dealing with a pretrial situation. In Hernandez-Bosquez, this court said that Harper is an independent provision from Snell. And that is so vital that when you have a determination by the Bureau of Prisons that the defendant is dangerous, that that operates as a separate ground, as Judge Pires was talking about, to medicate a defendant. It is independent and separate. So when the defendant tries to grasp the requirements of Snell- I'm sorry. I don't think you understood my question. I'm not going to suggest to you that somebody who's been found to be dangerous can't be medicated, whether he's pretrial or an inmate. I think you misunderstood my question. The question is, who makes that determination? The Bureau of Prisons. Well, no, you say that. You say that. But where does it say- Harper. Okay, tell me where. Harper says- Where in Harper? Harper says to treat a prison inmate who has a serious mental illness- Okay, I'm looking at Harper. Tell me where in Harper. It's the standard of Harper. Just tell me a page. Your Honor, I think I have it in my response. Just a moment. Okay. Tell me where it is. We can both look at it together. It's the general standard- No, no. Page, page, page, page. Yes, Your Honor. Page. The general standard that sets forth- Not the page. The page given here is Harper at 227. I have it. So that's the standard to treat a prison inmate. We hold it given the requirements of the prison environment. Prison environment. Are we dealing with a prison? Yes. We are dealing with an individual who has been committed to the Bureau of Prisons, and that's where the CFR comes in, too. The CFR was crafted in the wake of Harper. Do we have a prison inmate? It says to treat a prison inmate. Do we have a prison inmate here? It says a dangerous- I'm asking you, do we have a prison inmate here? Is Mr. Lochner a prison inmate? Well, he is in the same context that I would suggest is in this. Excuse me. Do you represent the Bureau of Prisons here? I'm sorry? Do you represent the Bureau of Prisons? I think I represent- The United States. So you should know the answer to the question I'm asking. Is Jared Lochner a prison inmate? I mean, you know, it's a simple question. Your Honor, I apologize if I'm not satisfying you. I'm asking you whether he is a prison inmate. I think he is the equivalent of a prison inmate. When I think about somebody who's committed- Why are you just not saying yes? Because I want to be accurate. I think there's some law that says he isn't a prisoner. He is not when he's committed to the Bureau of Prisons. He is in the custody of the Attorney General and the Bureau of Prisons. And I think he is that equivalent of an inmate. That would be the word for it. And I think it is. Can I ask you- Sure. I would like to go to another question because this is what's really troubling me about this order. I'm looking at the due process hearing appeal response. Harper says that you don't need a judicial hearing. It basically says it's not the business of the judiciary. if the inmate is gravely in danger of being gravely disabled or a danger to others. When Harper says that, do you understand that to mean a danger to other people? Yes. All right. Here's the finding of your warden. Your warden says that based on independent evidence and examination, the hearing officer concluded involuntary medication was in your best medical interest. Without psychiatric medication, you are dangerous to others by engaging in conduct like throwing chairs that is either intended or reasonably likely to cause physical harm to another or cause significant property damage. My question to you is, is the warden allowed to force medication on Mr. Loughran when the danger might be property damage? Your Honor, I think that that has to be coupled with the finding that was actually made in the justification. I thought our deference was to the warden. Yes. And I'm looking at the statement you're looking at. Warden's statement. Yeah, I'm just looking at the page of the Harper hearing on page 11 of the Exhibit 1. Wait a minute. I don't have it that way, page 11 of Exhibit 1. Okay. Tell me the name of the document you want me to look at. Yeah, it's the Harper hearing involuntary. Sorry, it starts with involuntary medication report. It's Exhibit 1, the government's response. It's on page 6, it starts. But the justification section is on page 11, and you'll see that it says he was informed that on the basis of a diagnosis of mental illness and on actions in his part dangerous to others within the correctional setting. So there's a finding that it's a danger to others. It's not a finding that he's medicated. And he appealed that finding to the warden, which is part of the process that is dangerous, correct? Right. And the warden didn't stop at dangerous to others. How are we supposed to read that? I think you read it, Your Honor, as he's affirming. But you're saying we don't read it. We don't just line out cause significant property damage? No. I think what I'm saying is that's on the form that they determined and then the warden's form. The form doesn't even meet the requirements of Harper then because, as you just told me, Harper requires either danger to yourself or danger to others, basically. And that's the finding, Your Honor. I'm confused, I guess. I apologize. But on page 11 of the Harper finding, it specifically says danger to others and also the diagnosis of mental illness, which has to do with the medical interest part that I think you mentioned when questioning Mr. Kahn. I think what Judge Ward was trying to get you to answer, not particularly successfully, is you have a finding by the original officer which is then affirmed by the warden and the warden throws in an additional reason that is not in the findings of the original officer, which is property damage. And this is a very good question. I would like to hear your answer to it. When the warden says, oh, I affirm what the officer did because of this plus property damage, what do we do with the property damage? Is that a justification, property justification under Harper? Do we ignore it? Do we say the warden would have come to the same conclusion even if there were no risk of property damage? He didn't take property damage into account. What do we do with it? I think you have to read it all together, Your Honor. And, again, one of the problems with this, and I think this Court has identified it early on, is we have to What does that mean, read it all together? Read that we have the Harper determination that he's affirming. And what you have in that Harper determination is a finding that he's dangerous. Let me give you a different example. Let's say he had said, and also because he's white, you know, because he's dangerous rather than because he's white. Let's say he had said that, and that wasn't anything taken into account in the original hearing, or because he's six foot three tall, however tall he is. He adds this additional factor. What do we do with this other thing that he relies on that is not based on the hearing, it's not based on the findings, and it's not something that Harper says is an appropriate justification? Your Honor, I guess all I can answer, and I think it's not satisfying the Court, I apologize, but all I can say is that if you look at that determination of the appealed person here, as well as the underlying determination, it's evident that he's being medicated as a danger, not because he was thrown at the discretion of property. You're just eliminating a step. I mean, until that point, I'm probably more inclined to say, okay, they followed the process. Maybe that's all the process that's due under Matthew C. Eldridge. But then he has a right to appeal in this process, and you're telling us to forget the appeal and forget what the warden actually wrote as the determination of the appeal. Aren't you telling us to read out the appeal because you're saying to us, let's stop at the point where we have something that Harper blesses? I think to the extent that there's language used about property damage that was not part of the ultimate determination, you still have him finding that he's a danger. I think the warden needs to change his form. Very well, Your Honor, but suffice it to say, if this court is going to examine it, I see I only have a minute and a half left. Oh, no, no, you're going to be there for much longer. I've got tons of more questions. Very well, Your Honor. Don't even think about sitting down. While we're focused on the warden's decision affirming the original finding, if you just go on to the next statement here, it says, at this time medication is the best treatment for your symptoms. Minor tranquilizers, seclusion, or restraints are only temporary in nature and have no direct effect on your symptoms or illness. It sounds to me, like when you read that, that really the whole purpose here was to provide medication to treat his underlying mental illness. Well, that's part of it. It's not all of it. Well, it sure looks like in the end that that's really what it was all about. Again, I really would discourage the court from what I would call parsing and not looking at the whole thing. At the whole thing, he's found to be a danger, and he's also found to require this medication. The reason that medical interest is important, because that's part of Harper. Harper says it needs to be in his medical interest. So when they talk about how he has schizophrenia and how this medication is the best known treatment for that, it's important in a Harper context that that be done. And so it's not a cell thing. I was going to ask you about this. I don't see any finding by either of them that this is in his medical interest, which seems to be a specific requirement in Harper. This is on Page 27, Page of Decisions. And the treatment is in the inmate's medical interest. Who makes that finding? That's the finding that they've, again, by finding that, and I think, again, reading it all together and looking at the Harper hearing transcript. Well, you can't just pick one word here and one word there. You've got to give me a full sentence. Why don't you tell me where? I've got Page 11. I've got Page 4. I don't see either of them. 11 being the underlying hearing determination by the hearing officer, and then there's a word determination. I don't see the phrase the treatment is in the inmate's medical interest anywhere there. So tell me what it is in either of those findings. I don't know that he has to use that magic word, but you have it. Actually, here, I'll help you out on this, but I don't know if it helps you out as far as you want to go. But on Page 9 in the findings, there's a checkmark next to it. It's in the patient's medical interest. Thank you. I thought I saw it in here, but I couldn't find it. Okay, yes. Okay, so there are these checks. Involuntary medication is approved as in the patient's best medical interest. But then it says check all that applies, and the only thing that's applied is, it's checked as applying, is the patient is dangerous to others by actively engaging or is likely to engage in conduct which is either intended or reasonably likely to cause physical harm to another or cause significant property damage. That's the one that you want me to read all together. The justification section on Page 11, again, that on the basis, and this is where the conclusion comes in. So, again, I would encourage the court to read it all together. Right, but this is the findings. I'm just saying these findings aren't consistent with what Harper requires. I disagree. I would disagree with that, Your Honor. Again, and perhaps we will disagree, but I would disagree. I think that what they did here is precisely what Harper says. You have evidence here, and they make a finding that he's dangerous to others, and also you have the finding that it's in his medical interest and also that there is sufficient justification for that. Right, but it's not in the conjunctive. It's in the disjunctive. It's either danger to others or likely to cause significant property damage. It's not a conjunctive. All I can say is what I said before, I guess, on that, Your Honor. I just think that based on the whole. Let me ask you, have you focused on this at all before in your hearings with the district court or in the briefings or anything? Not on the property damage issue, no. Okay, so no one's focused on that. No, but again, I would submit that the finding that they are making is dangerousness to others based on page 11, and that cannot be overlooked in terms of, you know, when you talk about a determination by the BOP, is this person a danger to others? Yes, that has been determined. We have that language in there. I don't think we want to have, and this is one of the reasons why I think that in Harper the United States Supreme Court says this is not the business of judges, it's the business of doctors who are complying with a regulation, a CFR, that is compliant with Harper and making these determinations as doctors. And you can tell from here, from this record, that they did make the determination that's necessary under Harper, that he's a danger to others and that he is in his medical interest because of his disease and that, you know, they have to show that this medication is justified. Now, what finding, where in these two documents, is it indicated what medication he is to be given? Your Honor, that's on page 1, or exhibit 1. That was the, I think this gets back to your question at the beginning, about, I think either you or Judge Pius had asked about that. This is the Dr. Farrison prescription, and the defendant had agreed to take it orally, and he was tolerating it well before he was able to take it. I don't think you understood my question. I wasn't asking what was he given right now, because I think that's a good answer to the question I asked earlier, but I was actually asking the question of where in the determination of the medical examiner or the hearing officer or the warden is there a finding as to which medication is appropriate? There isn't a finding, and it's not required under Harper. You mean they could put him to sleep? No, whatever. They could give him Latin gas? I mean, they could give him anything at all? No, it has to be... It can't be any drug whatsoever, right? No. There has to be a finding that certain things or certain classes of drugs or certain specific drugs are appropriate. I'm just wondering where it is in these findings as to sort of the... There isn't any at the Harper stage, Your Honor. Not that I can see, but what you have... Again, I would encourage this Court not to parse this so tightly compared to what is required under Harper. Harper does not say you have to have a dosage and diagnosis of the medication present there at the Harper hearing or else Harper doesn't apply. And that is what the defendant is trying to grasp from cell to Harper, and that's not required under Harper. So when we have these... How do we know whether these things on page 1 fall within the authority of the order, the authorization that the Harper hearing was over then? Well, Your Honor, again, that's a doctor decision, a medical decision. That's the reason why the United States Supreme Court in Harper said we defer to the doctors. Judges don't get involved with this. It's for this reason. The doctors are determining. There's a danger in the prison. This defendant is going to... So you're telling me this is not... The determination does not say what drugs or what type of drugs. It doesn't limit it in any particular way. Is that what you're telling me? No, in terms of limit... Okay, how is it limited? We have to do... Doctors are going to do what is medically reasonable for this person. They're doctors. He's an individual we're treating. They're monitoring him. Here it says involuntary medication is what I see on page 4. That's the original. It says involuntary medication. It doesn't say psychotropic drugs or anything else. It could be penicillin. It could be morphine. It could be sodium penicillin. It could be anything. It says he'd be better off being anesthetized. Your Honor, on page 11, it says treatment with psychotropic medication is universally accepted as a choice for conditions such as Mr. Lossner's. Again, we're not in the situation where they're going to use something that is not appropriate for this individual who has this particular diagnosis. And I think, again, the reason that I think this is reviewed for arbitrariness, at least the Fourth Circuit did it in Morgan, is the amazing amount of deference given to the Bureau of Prisons and the doctors in these findings. This is not fell. The judge has not been involved in terms of ordering him forced medication to restore competency. This is solely Harper. He has been ordered by the BOP, pursuant to Harper, as an administrative decision and as a result of this finding of dangerousness and medical interest. And that makes this wholly separate. And Hernandez-Vazquez, again, I want to really restate that, says that Harper is independent of fell. Harper is something you're supposed to look at before anybody gets to fell. And as far as this dual-purpose argument. As I recall, Your Honor, that was an appeal of a fell order, yes. Of a fell order? That means it would be. Well, what I mean is that's an appeal of a fell order to the extent that if Judge Kaczynski is suggesting that Harper doesn't apply to pretrial detainees, then this court in Hernandez-Vazquez wouldn't even have gotten to the question of whether or not there was Harper. That's the key there. You have fell, and then this court in Hernandez-Vazquez saying, you know what, we want people to look at Harper first. It's a more straightforward, it's a medical decision, it's part of the Supreme Court's decision for dangerousness, and that is a separate and independent ground. I'm sorry, but that was a district court order of pulling medication. Yes. So I'm not sure why. Well, you asked about pretrial detainees, and so to the extent that Hernandez-Vazquez dealt with the medication of a pretrial detainee, had this court believed that Harper was inapplicable to a pretrial detainee, then this court in Hernandez-Vazquez wouldn't even have gotten to Harper because they would have found that it is inapplicable in a pretrial context. But this court in Hernandez-Vazquez said that we go to Harper before you go to fell, and that is black-letter law. And so that's the reason that the defendant's law… I'm sorry. I have no idea what you just said. It's completely, complete nonsense. I mean, I just didn't follow. Harper was a case involving a pretrial detainee, right? Post. You said Harper was a case dealing with… I'm sorry. Hernandez-Vazquez was a pretrial detainee? Yes. Okay. And Mr. Lochner is a pretrial detainee, right? Yes. Harper… Hernandez-Vazquez was a district court order, not a prison order, right? Yes. Okay. And here we don't have a district court order. We have district court deferred to the prison. How does Hernandez-Vazquez help you at all? It helps… It seems to me if that stands for anything, it is that we are dealing with a pretrial detainee. You have to have a district court order. Actually, no, Your Honor. Your premise, as I understood your question, you asked me, why is it that we know that Harper still applies to pretrial detainees? In Hernandez-Vazquez, when this court was evaluating that cell order, it said Harper is a separate ground to medicate an individual, and we're going to send it back to make the district court determine, in that case at least, have an inquiry about whether the government could do this. Now, if Harper did not apply to pretrial detainees, then in Hernandez-Vazquez, this court would have simply just gone to cell. Hernandez-Vazquez stands for the principle that Harper is separate from cell, and Harper is a ground upon which to involuntarily medicate an inmate, regardless of whether it's pretrial or post-trial. You know, I only had a chance to do some quick research last night, Your Honor, and I'll do a 28-J letter on this, but there's a Sixth Circuit case called Green 532 S. 3rd 538, and in footnote 5 of that case it says, the cell standard applies when forced medication is requested to restore competency to a pretrial detainee, and the pretrial detainee is not a danger. And it says here, when the pretrial detainee is a potential danger to himself or others, the Harper standard is used. So at least the Sixth Circuit has recognized it. I think what you're telling us about Hernandez-Vazquez is just not right. Do you have it there to look at? If I'm incorrect, Your Honor, that's not my intention. Well, I'm not accusing you of lying. I just don't agree with your reading of the case, so that's why I'm asking a question so you can destroy me. Do you have it there in front of you? Yes. Okay. I'm looking at 513 S. 3rd, and I'm just looking at the discussion section, which starts on page 912. Page 913? 912. This is where it says discussion, so we'll be carrying this. Yes. And they say that parties agree that cell, as the United States, governs the incident dispute. Right. It's a cell case. You're not going to listen. You're not going to be able to answer my question until you get to a point where I'm actually asking a question. Right? Sorry, Your Honor. So just listen, okay? So they say that's the topic of the entire discussion. This is a cell case. Precognitively cell-wise. Now, if you go to the next column, next paragraph, they consider the analysis, the Supreme Court began its analysis in cell  So as best I can tell, the discussion in Hernandez-Vazquez about Harper and the Riggins are only by way of usurdating what cell means. Am I not right about that? That's how they start. But then the court goes on, and that's the heart of Hernandez-Vazquez, is that they say you have to get to the Harper decision first. So if Your Honor is correct that Harper would not apply to pretrial detainees, then the court would not have said Harper applies in this context, or let's examine whether it does apply, and let's send it back. So, again, I disagree that Harper is somehow limited to the post-trial context. I just do. It's a number of reasons to say that. So are you saying that Hernandez-Vazquez is a pretrial detainee? Well, it's a person who is, yeah, let me look here. This is an illegal, an individual who was charged with illegal reentry, as I understand. And he had been, there was a court order on cell, okay, and the court ordered him to be medicated to restore competency. It happened pretrial. This was before trial. So in Hernandez-Vazquez, the question became, do you get to cell without looking at Harper? And the court said, no, you don't. You have to look at Harper first. So if Judge Kaczynski is correct. I need the notes. So what's your cite for Hernandez-Vazquez? It's 513 F. 3rd, 908. Yeah, this question you're talking about is at 915 and footnote 3. But does the court ever say, he talks about Harper as a substantive standard. Does it ever say, oh, why didn't they just have a prismated affirmation under Harper? Yeah, it asks why we need to examine first whether or not this individual can be medicated for Harper reasons. Okay, did you hear my question? I thought that was the answer to your question. Forgive me. I don't think you stopped to listen. Do they ever say, this case should have been decided by the warden, by the prison authorities or the district court? It does say there's a different standard under Harper as to dangerousness. So Riggins deals with trying to restore somebody to competence. Harper deals with dangerousness. But does Hernandez-Vazquez talk about having the decision made by prison authorities rather than by the district court? What this court did, yes, this court says that the court Wait. Wait. If I understand you Wait. Sorry. Just tell me when. Can you repeat that question again, Your Honor, just to make sure I'm answering it correctly? Where in Hernandez-Vazquez does the court say this decision should be made under Harper by the prison authorities, not the district court? I see where they say the Harper standard should apply. In other words, dangerousness rather than the Riggins or Sell standard. But where does it talk about having the decision made by the prison authorities? Why the district court anyway? That's Harper, though, Your Honor. That's Harper. Harper says it's made by the prison authorities. Your answer is nothing but. That's what I understand. But you've got to start with answering my question. Let me try. Where in Hernandez-Vazquez does it say that? I have a couple of places, Your Honor. I've got Hernandez-Vazquez. I'm waiting for you to tell me where to look. Start with the page number. Yes, page number. Column. Page number 914. Okay, I'm there. The right? At the bottom. Left-hand column? Right-hand column. Okay. I'm sorry. Let's start with the left-hand column. Okay, I'm there. The Supreme Court stressed the cell in prison dependent. I'm sorry. I'm looking at 914 in the left-hand column, and I don't see. Most of the left-hand column is a quote from something. It's a quote from Cell, and I wanted to start with that, and then I'm going to take you through. Okay, where? The part where it says, after identifying the required findings, the Supreme Court stressed that a cell inquiry is independent of the procedure that allows involuntary medication to occur. I'm sorry. I don't know where you're reading from. I'm actually on page 9. It's at the bottom of page 913, I guess. Okay, I'm looking at that. Okay, I see it. So then it says, in fact, the court stated explicitly that consideration of an involuntary medication order based on dangerousness is preferable to consideration of an order used to render a defendant competent for trial. And then it also goes on. On the bottom right-hand side of my page, where 914 is, the government could – this is the Cell court now – the government could pursue multiple grounds for forced medication on remand, quote, including the dangers Cell poses to himself or others. And then it goes on. Let me just skip to this one part here. You remember my question. Yes. Where do they say the warden could have done it or should have done it? That's what Harper says. So when it says you need to go to the Harper inquiry – No, no, no, no, no, no. I don't want an answer about what Harper says. I want to say, where does Hernandez-Vasquez say that? If you say, no, it doesn't, but Harper does, that's fine. But you have to start out by saying, no, it's not in Hernandez-Vasquez. Does Hernandez-Vasquez say this is a decision that should be made by the warden? It says this is – it says that you go to a Harper inquiry. Now, Your Honor, a Harper inquiry is by the prison. In other words, this is precisely what Hernandez-Vasquez stands for. It could be, or it could be saying that this is a court on remand, would apply the Harper standard. But that would go against Harper because Harper says you do not need to have judicial blessing of a Harper order. You see, when you marry up Hernandez-Vasquez and Harper, the defendant's argument has nowhere to go. In other words, it's not in there. The answer to my question is it's not. It is. You have to sort of infer that that's what they meant. But don't they talk about the district court could apply Harper on remand? Doesn't it talk about the district court applying Harper on remand? Let me just look real fast, Your Honor. You read me last time, didn't you? See, I told you you wouldn't be sitting down in time, so. On remand, the district court should remain mindful. Now, again, this deals with dangerousness. Okay. But to keep the distinction between involuntary medication. On remand, the district court should consider having the prison lose determination. It doesn't use that specific language. If that's all you're asking, no. Does it use any general language on this? Well, when it says you have to remand for a Harper inquiry and Harper says it's by the prison, then I think, Your Honor, that's the answer to the question that I can give you. And if that's as good as it gets, I'm sorry if it doesn't satisfy the court. You don't have anything better than that, right, is what you're saying? Actually, I think it's pretty good. I think that Hernandez-Vasquez and together with Harper absolutely answer the question. But, in fact, whether it's good or bad or indifferent, you don't have anything better than that. Better in what way? Better in the explicit in Hernandez-Vasquez. They don't say the determination should have been and could have been made by the prison. They don't say that. Not in my recollection of this case, no, Your Honor. But when they say it has to be done by Harper and Harper— That's the part that is as good as it gets. But, again— You don't have anything better. Well, I think the Supreme Court's pretty good. In order to disregard—I mean, in order to do what the defendant has asked in this court to do, you've got to disregard rule Harper, I think. Can I just—I just want to slow down for one second. I just want to ask you something that, again, I find troubling about this. It seems to me that in a case—not all pretrial detention, but in a situation where there's a pretrial detention because someone's been found incompetent and they are sent to an institution for restoration of their competence, that that is a different situation than when someone has been convicted and is serving time in prison. And, yes, the DOP needs to administer to all prisoners medical needs. In this case, their sole goal is—the goal they're commissioned to do is to restore competence. So, by virtue of that, shouldn't, in these types of cases, the Zell line apply? Is this because Zell applies when you're trying to restore competence? No. And the reason for that, Your Honor? I mean, you mentioned that their goal is to restore competency. Actually, it just says to determine whether there's a substantial probability—I'm reading from 4241d.1— that they shall hospitalize the defendant or hospitalize the defendant for treatment in a suitable facility for such a reasonable period of time, not to exceed four months, as is necessary to determine whether there is a substantial probability. All right, counsel. So did the district court get it wrong when the district court in this case said the task of the FMC staff is to determine whether the defendant will become competent in the foreseeable future, and if so, to oversee his mental restoration? That's not incorrect. What I'm saying is their goal, though—I want to be real specific here, because they're suggesting that the goal of COP is to make him competent for trial. Their goal is to assess whether he can be. And that is a distinction, and that's part and parcel of—remember that argument they were making below? Well, what does it mean when it says to oversee his mental restoration? I think that means that when they're talking about whether he can be restored, there's usually a report that gets generated after that. Does that assume that he's going to do it on his own? Does that assume that he'll agree to take NEDS? No, it assumes, I guess, that in the process of determining whether or not he can be restored, there's going to be a question about whether he is medicated, but not in this context. This is not a medication to restore competency. I don't know. Once he's been determined to be incompetent, how do we know he's even competent to make a decision about whether or not to have his medication? And perhaps that's why the Supreme Court, in that sort of situation where the issue of competence, wanted a judicial hearing. Your Honor, the reason that Harper is different, though, is his dangerousness in the prison context. You see, that's the difference. We are not talking about medicating this defendant to restore his competency for trial. That's over here. That is not a requirement. And the Supreme Court has not said that you have to use, sell, and import it. And, again, that would be contrary to Hernandez-Vazquez. It says you keep them independent. So when the prison is trying to assess someone, they have a duty, and Harper even says that, you have a duty to protect your staff. And when this defendant is throwing chairs against a wall and spitting at his lawyer and doing these things that are very volatile, and remember, they know that he's charged with murder, so they have to view everything he does in the prison through the prism of that. They cannot take this chance with their staff that they have. Again, Harper talks about this duty. So they convene this Harper hearing, and I want to be also clear, the CFR says it's after you're hospitalized. I know there's a comment that's made in the pleading where the defense talks about how, well, they didn't do it before he came back, but the CFR talks about how it's after he has been hospitalized and prior to administering involuntary treatment. So what they do is when he comes back, they ask whether or not he's willing to take medication, and if he's not, they convene the Harper hearing to determine whether or not he's a danger, and they did precisely that. They did precisely what Harper says to do. And so that's the reason why the defendant can't demonstrate a likelihood of success on the merits. Remember, this is about the injunction, of course, not the resolution of this case. And if the defendant has to show that he has this likelihood of success as part of a test or else he does not warrant stopping the medication, that's what we're here for today. Any serious questions about all of this? Just listening to you argue, it sounds like serious questions. Actually, no. Honestly, Your Honor, when you take a look at Harper and Hernandez-Vasquez. Well, I did, and I just tried to go through you with Harper, and Harper doesn't specifically apply to pretrial detainees. But, again, I guess we would submit, Your Honor, that, again, I think Judge Wardlaw asked Mr. Kahn. Actually, it's worse than that for you because I've got another page in Hernandez-Vasquez that I need you to look at. Look at page 919. Right-hand column? Yes. There's a paragraph that says, We also note. And I look at this paragraph. Let's start with the second sentence. The district court did not attempt to accept or reject the government's position explicitly, but rather concluded it could consider dangerousness in the context of how prior criminal history would affect the applicable guidelines and sentence range. On remand, the district court should remain mindful of Supreme Court's distinction between the purposes and requirements of voluntary medication to restore competency and involuntary medication to reduce dangerousness. It should take care to separate the cell inquiry from the Harper dangerousness inquiry and not allow the inquiries to collapse into each other. Now, to me, this sounds to me like what our court said there is that the district court conducts both inquiries because you can't very well let the two inquiries collapse on each other if you're not doing both of them. If you read it that way, Your Honor, then you're suggesting the district court makes the finding in the first instance, and I disagree with that. Well, that's what it says. I disagree. What you have in Hernandez-Vasquez is a cell order. There was no attempt to do a DOP determination of dangerousness. Let me ask you, why isn't the passage I just read to you, a holding by our court? I'm sorry, can you say that again? Why isn't the passage I just read to you from an opinion by our court that's binding on this panel, a finding that when you're dealing with a pretrial detainee, the Harper inquiry is made by the district court? That's not what it says. How can the two inquiries, how can the district court keep the two inquiries separate? Unless the district court does both inquiries. Well, no, on remand what happens is if the Bureau of Prisons makes a determination that he's dangerous, then you're not going to have to get to cell. So that's what that means, and you can't divorce that language from the language about how cell is independent from Harper, and Harper is a Bureau of Prisons determination. Harper was all about, do you have to give a judge, do the judge have to bless this? Do you have to have an attorney present? And the Supreme Court said you do not because of the nature of the Bureau of Prisons inquiry here, the deference given to the medical doctors, and we're talking about dangerousness of the prison. And so those are the overriding considerations in Harper. When this court says they're separate and it remands back, it's a determination now, the government would be going to the Bureau of Prisons and saying, okay, let's have a Harper finding, or the Bureau of Prisons would engage in an on its own. And when that determination happens, then the court doesn't have to get to cell. I agree with the passage. Let me ask you a different question. What do you do with the fact that when Mr. Lockner asked for his lawyer to be the witness, he was asked whether he wants to have a witness present, and he said, I want my lawyer. And the lawyer is a witness, and he wasn't allowed to notify or bring the witness. Isn't that part of the Harper minimum due process requirement, the ability to present witnesses? Your Honor, that's not what was found below by the district court and by the staff representative. On the 2nd of June, when he got the notice of hearing, he was asked whether he wanted witnesses. He said no. On June 13th, the day before the hearing, he was asked whether he wanted witnesses, and he says no because it's a violation of my civil rights, and there's some language that is on page 8 of our Exhibit 1. On June 14th, he's asked, does he want to have witnesses? He says, just my attorney. Now, the Bureau of Prisons interpret that reasonably as a request for representation, not as to call an attorney as a witness. If you look at the last footnote of the district court's order, there are some fact findings being made there about whether or not the Bureau of Prisons would reasonably have interpreted that as a request for a witness. I'm sorry. How did the district court make the findings? Do you have the witnesses on the stand? In terms of the finding by that, there's language in the last part of the order. I'm just wondering. I'm asking a question. Were these witnesses that the district court made? Well, I think the way we look at this is that— Did the district court—I'm just asking you were there. I wasn't there. Were these people subject to discrimination? No. What it was was the district court—and, again, we are looking at this, and I would really like to— The district court looks at what we're looking at, right? I would really like to— The district court is looking at what we're looking at. Does the district court see anything we're not seeing? Yes. When it comes down to whether or not this district court abused its discretion in denying a preliminary injunction and in finding that the Bureau of Prisons was not arbitrary, in that process, he's finding, I think, that he did not— Okay. Humor me. Let's say we disagree with you on that point and say he really did ask for a witness  And it turns out that it's a witness that is relevant to part of the reason that the prison found him dangerous. Among other things, he lunged and spit on his lawyer. There were two incidents cited. One of them was a chair-swimming incident, and the second one is the lunging incident. Actually, there's more than that. There's more than that. We have the incident with Dr. Peet, and we have the incident where he's throwing his chair. We have the incident of spitting and lunging. We have the incident on 6-6 where he's talking to Dr. Brandt and he throws his chair. We have an incident on 6-8 where he's throwing his chair. There were two chair-throwing incidents. Multiple chair-throwings. Okay. So there were chair-throwing incidents, and then there was the lunging. Now, the chair-throwing was when no one else was in the room, right? He was throwing chairs. One of them, I can't tell from the notes for Dr. Brandt on 6-6 whether or not—just a moment, Your Honor— whether he was in the room or not. But he talks about having an interview with him and that he appeared angry. He stood up to his chair full force at the back wall. And so we have these determinations. If Your Honor is asking what difference does it make, presuming you make a determination that he was asking for his lawyer's witness, one of the things we know is the defendant can't show any kind of a prejudice from not having been able to testify about that because we have the Bureau of Prisons who saw what it saw. The essence of what the argument was is that had she—I think they're presuming he was asking for Ms. Clark as the district court noted there's no mention of who he was asking for and that it seemed that he would not have specifically said, I want to witness Ms. Clark testify about blah, blah, blah. Had she testified as was alleged below that she either would have said he didn't want her, that she wasn't afraid, they failed to demonstrate. If you look at Morgan, there is a prejudice aspect to Morgan. And we would submit that that lack of prejudice, too, would militate against any kind of a determination that that is any reason to remand. As a matter of fact, again, the burden being on the defendant here in an injunction standpoint cannot demonstrate. So I even have a hearing. The Bureau just said, this is what happens. You're a danger to others. End of story. Well, they have to do certain procedures and practices according to Harper and the CFR is compliant with Harper. Well, it sounds like what you're saying, though, that Ms. Clark couldn't have said anything that would have made a difference. No, it's up to them to demonstrate it would have made a difference. You see, that's where we're at. I mean, it's an injunction perspective. And, again, it was not unreasonable. After the defendant says he doesn't want witnesses three times, wait, yes, twice, the second and the thirteenth. And then when he says, just my attorney, on the witness, you can understand why the Bureau of Prisons says that's a request for representation, and Harper does not permit representation. They're not suggesting they're in bad faith, but maybe they're mistaken. But that's the problem. How can the court step over BOP like that and make a factual finding as opposed to the doctors who are right there talking to him? Humanly imagine, if your imagination lets you, just imagine we did it anyway. So I'm trying to get you to focus on the legal issue, and you keep fighting the hypothetical by saying you can't do that. But just imagine we can and did. And let's say we look at the situation. We say he asked for a witness. He was denied a witness. Harper talks about being able to bring witnesses. He was denied this. And do you have an answer to that question? And the answer can't be, oh, you can't imagine that. That doesn't help any. That doesn't help any. It just doesn't advance the argument. You have to sort of accept the basis of the question and then imagine that, in fact, he wanted a witness. He asked for a witness. He was not allowed to bring his only witness, and Harper says he's entitled to witnesses. What do we do with that? Your Honor, if you were to make that finding, and, again, I would strongly discourage you to do something like that. You're wasting time. But if you do it, then we would say that the defendant had the burden of demonstrating prejudice in that in the same way that Morgan talked about it. And he would not be able to demonstrate that, even if Ms. Clark had said I wasn't afraid or he didn't lunge at me, that that would have made a difference to this determination of dangerousness when the Bureau of Prisons said these are the facts that occurred and there was obviously somebody there to see that. So, again, I respectfully disagree that even if this court goes there, that that somehow changes things. It doesn't. And the defendant, again, has the burden. I'm sorry. I'm trying to make sure I understand what you're saying. You're saying it wouldn't have made a difference because she's not believable and the Bureau of Prisons would have always believed the other witness? No. What I'm saying is it's her burden. It's the defendant's burden to demonstrate because we're in an injunction stage, Your Honor. We're not in an equilibrium here in terms of even Stephen. They have the burden of demonstrating. It's likely to be a success. So they would have the burden of demonstrating if there had been some kind of a procedural. What's the burden on the government if Mr. Larkin, who's been in custody now since January, I believe, right? He's been in custody since January and not medicated. What if he's kept in custody for a while, long and not medicated, until this court? I'm sorry. Kept in custody longer. Say again? And not medicated until this court, and mayors panel of this court can decide the question. I'm not quite sure what the big hurry is, what the harm is to the government. Well, Your Honor, I think the... I mean, if you win, you're right, you will get him eventually and you'll medicate him. I mean, I can see the personal harm to him by taking serious drugs like that and forcing them into his body. But, Your Honor... You wouldn't want that done to you, and I wouldn't want it done to me. When you ask that question of Mr. Kahn, though, one of the things you noted is where is the irreparable injury, and I would say that back to you that... I remember my question to Mr. Kahn, and at least he tried to answer my question. Now I would like him to answer the question I'm asking you. And I have not forgotten what I asked Mr. Kahn, and I have my doubts about that situation. But it's not going to help you even a little bit to point to that. So my question now is of you and your client. What is the harm, what is the irreparable harm, or what is even the serious harm to your client if Mr. Larkin, who's been in custody for months and months and months and months and months, not medicated, stays in prison for a little while longer, not medicated? Will he be more difficult to treat in six months, or will he be... I mean, what's... I'd like to know what's ways on your side. When it comes to the question of the entrance at issue, one of the things the Bureau of Prison has been designated to do statutorily is to determine, I think, within a period of four months, if it's not extended, whether or not the defendant can be restored to competency or whether he can't. Again, that's an open question as the district court recognized. Victims, of course, are in this case entitled to a prompt resolution. When it comes to the question of... Resolution of what? I thought we were talking about... I'm sorry, resolution of the trial. I think you were talking about what if it's delayed. I think that's what you were saying. What's the trial date? Is there a trial date? There's no set trial date yet, Your Honor, but I think I'm pointing to the 42-41... I'm sorry, what does the trial date have to do with this? I thought that's a cell inquiry. When I try to restore him to competency to stand trial, we're talking about dangerousness here. You insist it's not a cell inquiry, it's a heart failure inquiry. Right. What does trial have to do with this? Your Honor, I was just quoting from 42-41D. What I was talking about was just the notion that the Bureau of Prison has been tasked with trying to assess whether he can be restored, whether he will attain the capacity to go forward. That seems, for a reasonable period of time, not to exceed four months. I mean, that's the only thing that does seem to be, at least in terms of a certain amount of a clock here, unless there's an extension. And they can't do that without medicating him? That's the essence of the Harper determination, Your Honor. It's to try to make this a safe environment for either... There are people who have to go in there and take vials of blood from him. There are people who have to interact with him. He has a food slot that the evidence shows is also a dangerous place. I mean, the bottom line is they have to be able to do this job under 42-41 safely. And that is the essence of why they did what they did under Harper. And this notion that they were doing it to mustache twist and get around a cell, there's nothing about that in the record at all because it does not exist. This is a finding based on dangerousness. It is permissible under Harper. And Hernandez-Vazquez's recognition that Harper is an independent inquiry from self. Well, you're kind of repeating some of your arguments, but this is just something new I'll just throw at you. The purposes for which he's being held here seem to have to weigh into the legal analysis. And the same statute that you're talking about, the same subsection, it says that the attorney general shall hospitalize the defendant for treatment in a suitable facility. So he is being treated. And I just have to infer from that he's being treated to restore his mental state, which equals competence. But, Your Honor, that's not – Maybe. Tell me how. I mean, literally, I discussed this with my law clerk this morning. Is the goal of rendering defendant competent a different goal than providing adequate medical treatment for his illness? It seems that the cell inquiry – Can you answer my question now? I'm sorry, Your Honor. I'm sorry. It's not the cell inquiry. I'm just saying, are these different goals that they're supposed to be treating him? Well, what are they supposed to be treating him for? Obviously, the mental illness. That is the very reason he's been deemed incompetent. So – and they're not treating him for a broken leg. So how do you separate that out from the legal analysis? I think all I can do is point, Your Honor, to Hernandez-Vazquez that talked about how they were separate. And so Harper – if they find that the inmate is a danger, then they medicate him for that reason. And if there's an incidental effect of him being restored to competency, that doesn't alter the fact that they had this legitimate ground to medicate him under Harper as a danger. And in so doing, they're ensuring the safety while they then go to the statutory question and statutory inquiry of whether or not he is capable of being restored. Well, actually, the way that I think the defense is looking at it is that due process isn't satisfied with Harper when it's the pretrial detainee situation based on incompetence because you need additional process. You need some judicial process to safeguard the rights of the defendant at this stage. I respectfully disagree with that, Your Honor, because the essence of the Harper determination is this notion that doctors are in the best position to determine whether or not someone is a danger in a prison setting, whether or not this person has a mental illness, which then shows that they can be – That's true. That's what Harper says. That's right. And so the answer to that question is it's not limited to this pretrial post-trial because when you're dangerous in a prison setting, you are dangerous. Whether you are dangerous if you get sent back under this situation or whether you're dangerous when you are there in another situation, it doesn't alter the government's, your prison's ability to medicate someone who is a danger. The pretrial context here does not alter the fact that Harper allows them to do it without a judicial authorization. Let me ask you this. You just said that at some point they've got to make a determination of whether or not he's competent or capable of being rendered competent. And suppose they say, well, as long as he's taking his medication, he's mentally sound and he can stand trial. He's competent to stand trial. Does that mean he's – and he's been taking his medication because he found that he was a danger to others. Does that situation avoid completely the need to go back to the district court for a cell determination? Yeah, you don't go to the cell – As long as you can say that there was a dangerousness finding, your position, the government's position is that that will obviate any need to ever go back to the district court. Well, no. You have to go back to the district court to determine whether or not he's competent. See, that's actually a big quote. Well, but what you said is as long as he's taking his medication, he's competent. So we don't have to go back to the district court under cell. Well, let me back up. When it comes to Harper, if they were to determine that he could be medicated under Harper, if it has the incidental effect of restoring him to competency, you never get to cell. And, you know, grape is a perfect example. I'm not going to take this medication. If he says, I'm not going to take it, and he's not a danger, then we go to cell. The question becomes then it has to go to a judge because then the question is can he be medicated to this level. How long is the dangerousness finding good for? I'm not aware of any deadline on that, Your Honor. I mean, I think it's just a question of as long as he's in the custody of the BOP for that period, I think. When it comes to... I mean, it seems to me that at some point they would have to go back to the district judge to have a cell hearing. And this is what I wanted to say, Your Honor, is at the end of my district court pleading below, I quoted some language from Morgan. And Morgan said, we're not going to have a situation where somebody at BOP says, okay, he's competent now, let's go to the trial. There's going to be a judicial hearing that occurs where there has to be this determination that he's competent. So, for example, if the defense was to say, you know, I think Mr. Loeffner, as a result of this medication, is not competent, then they question all that, that will get vetted in front of the district court. So he will have his process. You see, that's what happens after this point but not at this point. And that's the difference. And, again, I would point to our response at Exhibit 2. There's a quote at the end from Morgan about that. And that's why this court can be comfortable that he will get judicial process before any determination is made that he is competent to stand trial. That happens. Even if the medication that is authorized under Harper has the incidental effect of causing BOP to determine that and recommend to the court, hey, I think he's competent now because this medication has also had an effect on his mental ability and he can understand and help his lawyer now, the judge still has to make that determination. And we would have to show by a preponderance of the evidence that he is, in fact, competent to stand trial. So you do get that judicial authorization that happens at that stage. So this is not all happening at BOP's behest. The only question is whether they can medicate him under Harper for dangerousness while he's there and while they assess him. And in deciding the balance of hardship. So the harm to the government is the fact that they can't interact with him and, therefore, can't restore him to competence. They need to be able to do it safely, yes, sure. Right. But that is the harm. So this is really not a Harper-type harm. It's a cell-type harm. It's a cell issue. It is because you want to get him to trial. That's the hurry, right? Well, no. Well, the Bureau of Prisons has this time under the statute to do this assessment. That's where I'm getting the time from. That's what I'm talking about. And, you know, like the district court said, maybe they can back… And the time limit is set because the district court wants to get on with deciding whether or not he can be subject to the trial. Well, it's the statute that provides that four months that I mentioned. That's what I'm talking about. I see. But, like I say, as the district court noted, the VOP could determine he's competent or determine he's not later on after they are able to assess. But, see, we're at this point of can they assess him safely? And the answer that they've come to is no, they can't assess this sort of violent person in this prison context without medicating him to treat that disease and make it abate that danger. And that's the interest of the Bureau of Prisons here. Okay. I think that's the long answer you gave us today. Thank you. Thank you. Would you like to have a little time for rebuttal? Two minutes. First, if I could address the Fernandez-Vasquez point and just point the court to some language at page 914. Under Roman numeral I, maybe in the right-hand column on your page, I've got a Westlaw printout. But the specific language in the first paragraph under Roman numeral I is, Prior to undertaking a cell inquiry, the district court should make a specific determination on the record that no other basis for forcibly administering medication is reasonably available. If the district court does not conduct a dangerousness inquiry under Harper, it should state for the record why it is not doing so. I understand that language to mean that in the case of this individual, at least, the district court was to determine whether or not the individual was dangerous so as to justify medication of that individual. If I can come back to a point that I'm not sure I was completely clear on and just address it very briefly, which is that we believe that even if the government were right and Harper completely governed this case, and we don't believe it is so, that the findings made by the warden and by the examiner below wouldn't justify medication. And that's because Harper requires that before medication can be administered, or can be administered only if considered a less intrusive means, medication is essential to mitigate the dangerousness. And the finding... Where does Harper say you must consider less intrusive means? Regan said that that's what they held in Harper. And if Your Honor, I can get the specific pages. Sure. So this is Regan's gloss on Harper. I didn't see it in Harper itself, but I must say I didn't look at Regan's as closely. And I... Where in Regan's are you looking? I'm looking for the specific page number. I believe it's page 135 under the paragraph that begins under Harper and continuing on into the next paragraph. And there are two relevant quotes. Under Harper, forcing antipsychotic drugs on a convicted prisoner is impermissible, absent a finding of overriding justification and determination of medical appropriateness. The 14th Amendment affords at least as much protection to persons the state detains for trial. Then below that in the following paragraph, speaking of what due process requires again and citing to Harper, if the prosecution had demonstrated and the district court had found that treatment with antipsychotic medication was medically appropriate and considering less intrusive alternatives essential for the sake of Regan's own safety or the safety of others. And then the citation is to Harper. So that's how we... I think that that's the Supreme Court explaining what it meant in Harper. Finally, the last point I'd like to make is that the government keeps saying that Harper governs all and that Harper makes no distinction between pre-trial detainees and post-trial convicted inmates. And Harper simply doesn't address that. But I think it's impossible to consider the due process origins of Harper, which themselves are context-driven. Matthews versus Eldred said everything is context-driven in a due process inquiry. And the decision in Harper itself, which is extraordinarily context-driven by the fact that this individual had been incarcerated for 14 years, that it was necessary to get him back out into the prison population, that the facility he was in was dedicated to that purpose only, to treating him, to get him back out into the population. And I'd point specifically to footnote 8 of the opinion, where they discuss all the specific context and form their judgment that the procedures provided were adequate as an indication that where the context is different, the holding simply cannot be applied without consideration of those differences. Thank you. Okay. Thank you very much. Thank you.
judges: Kozinski, Paez, Wardlaw, Cjj